**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF  WEST VIRGINIA**
**CHARLESTON DIVISION**

**TERRY CUTRIGHT and JOHN WILSON**
**on behalf of themselves and others similarly situated,**

      **Plaintiffs,**

**v.**                                             **Civil Action No.:**_ 2:16-cv-06346_____

**MAYOR DANNY JONES, individually and in his official capacity, THE CITY OF CHARLESTON, and its division THE CHARLESTON POLICE DEPARTMENT,**

      **Defendants.**

## COMPLAINT

**NOW COME** the Plaintiffs, Terry Cutright and John Wilson, by and through the undersigned counsel, asserting that the Defendants, Mayor Danny Jones, the City of Charleston, and the Charleston Police Department, jointly arranged for and carried out the search, seizure and destruction of the Plaintiffs' personal property without providing prior notice or opportunity to be heard, and without a warrant, in violation of Article Three, Sections One, Six, Ten, and Seventeen of the West Virginia Constitution, the Fourth Amendment to the United States Constitution, and 42 U.S.C. Sec. 1983. The seizure and destruction of this property occurred even though the Defendant Mayor Jones directed and ordered these acts without notice, and not due to any immediate threat to public health or safety, but intentionally to prevent class members from seeking legal help to prevent the loss of personal property.

## PARTIES

1.      Plaintiff Terry Cutright is a homeless resident of the Charleston, West Virginia area. Up until January 19, 2016, Mr. Cutright had resided continuously for the prior three and a half years in the place known as Tent City in Charleston. *See* Ex. 1 (Affidavit of Terry Cutright).

2.      John Wilson is a homeless resident of the Charleston, West Virginia area. Up until January 19, 2016, Mr. Wilson had resided continuously for the prior three years in the place known as Tent City in Charleston. *See* Ex. 2 (Affidavit of John Wilson).

3.      Defendant the Honorable Danny Jones served as the Mayor of Charleston at all times relevant to this Complaint.

4.      Defendant City of Charleston is a municipal corporation, for which Mayor Danny Jones exercised final executive decision-making authority at all times relevant to this Complaint.

5.      Defendant Charleston Police Department (CPD or "Department") is an agency or instrumentality of the City of Charleston, West Virginia.

## FACTS

### *History of Charleston's Tent City*

6.      Tent City was a camp made up of roughly twenty or more tents that provided a nontraditional home to individuals and families. In addition to individual tents, Tent City contained a community storage tent and a common kitchen area. *See* Exs. 1, 2 (Affidavits of Terry Cutright and John Wilson).

7.      Tent City was located on the west bank of the Elk River, accessed by a footpath on the south side of the Spring Street Bridge, in Charleston, West Virginia. *See* Ex. 2 (Affidavit of John Wilson).

8.      Tent City has been inhabited by the homeless population of the Charleston area for substantially over ten years.  *Charleston Gazette-Mail*, "Charleston Mayor Orders 'Tent City' Dismantled," January 19, 2016. (http://www.wvgazettemail.com/news/20160119/charleston-mayor-orders-tent-city-dismantled) (statements in news video) (Last accessed June 14, 2016).

9.     Tent cities have long fulfilled the purpose of providing temporary housing for transient populations that—for a variety of reasons—cannot or do not always remain in traditional housing or homeless shelters at all times.

***The Defendants have previously represented an intention not to evict Tent City residents***

10.     Mayor Danny Jones has long been personally knowledgeable about Tent City.

11.     About two years ago, Mayor Danny Jones, or someone that the Tent City residents understood to be representing him, came to Tent City and told the residents that, as long as they didn't bother the nearby businesses, the CPD and the City of Charleston would continue to permit Tent City to exist.

12.     In or about August, 2014, the residents of Tent City had an interaction with patrol officers for the Charleston Police Department, which led the residents to fear that the police intended to evict them from Tent City.

13.     On or about August 20, 2014, a Major in the CPD informed the residents of Tent City, through counsel, that the Department had no plan or intention to evict residents or to dismantle Tent City. Furthermore, the CPD represented to the residents of Tent City, through counsel, that if the Department's intention or plan changed in the future, the CPD would notify residents in advance, so that the residents of Tent City would be clearly informed at that time of what the law required and the options legally available to them to assert and protect their rights.

***The destruction of Tent City was ordered and personally supervised by Mayor Danny Jones***

14.     The temperatures were extremely cold in Charleston, West Virginia throughout the winter of 2016, and specifically during the week beginning January 18, 2016, those living outside needed substantial personal property—including clothes, tents, heating supplies, ample food, and more—in order to keep from freezing and to stay minimally nourished.

15.     On Tuesday, January 19, 2016, Defendant Jones ordered the CPD to enter Tent City, and to remove and destroy the residences and personal property and possessions of the occupants of Tent City without prior notice, in the absence of any emergent circumstances or other justification for search, seizure, and eviction without notice or opportunity for hearing.

16.     Defendant Jones accompanied the CPD and the employees or agents of the City of Charleston to Tent City on January 19, 2016. There and then, Defendant Jones personally supervised the CPD and City of Charleston's agents as they rousted Plaintiffs from Tent City, evicted them, looked through Plaintiffs' belongings, and seized and placed those belongings into trash compactor trucks, which immediately compacted and destroyed those belongings.

17.     Defendants' policy of unwarranted searching, seizing, and immediately destroying Plaintiffs' property was personally conceived, ordered, supervised, and carried out by Defendant Danny Jones when he developed the policy, ordered the CPD to implement that policy without advance notice to the residents of Tent City, and then personally came to Tent City and oversaw the seizure and placement of Plaintiffs' personal property into dump trucks that immediately compacted the personal property and destroyed it.

18.     The United States of America's intergovernmental policy on homelessness clearly states that it is improper to force the dispersal of homeless encampments.  "The forced dispersal of people from encampment settings is not an appropriate solution or strategy, accomplishes nothing toward the goal of linking people to permanent housing opportunities, and can make it more difficult to provide such lasting solutions to people who have been sleeping and living in the encampment." *See* "Ending Homelessness for People Living in Encampments: Advancing the Dialogue," United States Interagency Council on Homelessness (2016). https://www.usich.gov/resources/uploads/asset_library/Ending_Homelessness_for_People_Livin

g_in_Encampments_Aug2015.pdf  (Last accessed: June 24, 2016).

19.     In December 2015, the U.S. Department of Justice's Division of Community

Oriented Policing Services published notice to over 6,000 law enforcement officers

nationwide—including upon belief the Charleston Police Department—regarding procedures for

engaging with homeless communities, including the Homeless Outreach Team (HOT) and Crisis

Intervention Team (CIT) models for supporting the homeless without criminalizing their

existence or arresting them. "Instead of arresting, ticketing, or jailing people experiencing

homelessness, HOT officers act as the connection to aid and assistance." *See* "Outreach and

Engagement: Collaborative Responses to Homelessness," *Community Policing Dispatch*, Vol. 8,

Issue 12 (December 2015).

http://cops.usdoj.gov/html/dispatch/12-2015/collaborative_responses_to_homelessness.asp (Last

accessed: June 27, 2016).

20.     Defendant Jones made public statements repeatedly indicating that he had

considered providing notice prior to the destruction of Tent City, but decided against it because

he expected that he and/or other Defendants would be subject to litigation.

21.     Defendant Jones stated in a news conference on January 19, 2016 that he had

made the decision to order the destruction of Tent City the week before. Yet neither he nor the

other Defendants provided Plaintiffs with notice of that decision prior to January 19, 2016.

*Charleston Gazette-Mail*, "Charleston Mayor Orders 'Tent City' Dismantled," January 19, 2016.

http://www.wvgazettemail.com/news/20160119/charleston-mayor-orders-tent-city-dismantled

(Last accessed June 14, 2016).

22.     "No warning was given to the folks living at Tent City along the Elk River.

[Defendant] Jones said that was so they didn't end up in court. 'There was a lawyer from

Mountain [State] Justice who got down there as we were doing it and he would've gone in court and tried to stop us and then we'd have to pay to fight it,' he said." *Metro News*, "Residents Lash Out at Charleston Mayor for Dismantle of Tent City," January 20, 2016.

http://wvmetronews.com/2016/01/20/residents-lash-out-at-charleston-mayor-for-dismantle-of-tent-city/ (Last accessed June 14, 2016).

23.    Attendees voiced opposition to the Defendants' destruction of Tent City at a City Council meeting on the evening of January 19, 2016.  "[Attendees] said there should have been more notice. 'That's how you have to do it,' [Defendant] Jones countered. 'If you would have warned those people it might have brought a crowd down there to stop it.'" *Metro News*, "Taking Down Tent City," January 21, 2016. http://wvmetronews.com/2016/01/21/tent-city/ (Last accessed June 14, 2016).

24.    There were no exigent circumstances justifying the eviction of Plaintiffs without notice or opportunity for hearing, or search and seizure of Plaintiffs' belongings on January 19, 2016.

25.    The property seized by the CPD at Tent City on January 19, 2016 was not contraband.

***Destruction of Tent City violated the Police Manual and Municipal Ordinance on law enforcement***

26.    The Police Manual of the Charleston Police Department assigns duties to police officers regarding the seizure and stewardship of personal property.

       a.    "Every reasonable effort will be made to return property to its rightful owner."  Manual § 28.0 (regarding the safeguarding and proper disposal of all property coming into the Department's custody).

       b.    "Officers are responsible for making reasonable attempts to locate owners

of 'found' or non-criminal property and returning property to the owner before turning property into the Evidence Unit." Manual § 28.1.

       c.      "Whenever appropriate, items should be photographed and returned to victims/owners consistent with prosecution guidelines and common sense." Manual § 28.1.

       d.      "Field interviews shall be reported using the Field Interrogation Report (CPD-104) if a citizen is searched or seized unless other departmental documentation of the search or seizure is made." Manual § 21.1 (amended September 24, 2003).

      27.      Defendants failed to comply with the foregoing requirements of the Police Manual when they ordered and carried out the compaction and destruction of Plaintiffs' property immediately after seizing it on January 19, 2016.

      28.      Charleston Municipal Ordinance Chapter 66, Division I, Section 33 incorporates the Police Manual of the Charleston Police Department into that Municipal Ordinance. ("[The Police] manual is hereby incorporated in and made a part of this section as fully as though it were set out in length . . . The manual adopted by this section may be known and be simply cited as 'The Police Manual of the Charleston Police Department.'").

      29.      When Defendant Jones ordered the CPD to destroy Tent City in the particular manner set forth above, his actions were unreasonably inconsistent with Charleston Municipal Ordinance Chapter 66, Division I, Section 33 and with the Police Manual.

***Tent City provided an important nontraditional home to the Plaintiffs and many other needy individuals***

      a.      <u>John Wilson</u>

      30.      Plaintiff John Wilson had resided continuously at Tent City for most of the three years prior to January 19, 2016.

      31.      Mr. Wilson and his fiancé shared a one-room tent at Tent City. Their personal

property at Tent City included a double-burner Coleman grill, three sleeping bags, clothes, cats named Ariel, Beanie, and Boots, cat food dishes, three bags of cat food, and other personal papers and effects that they stored in nine plastic tubs.

32.    Mr. Wilson also owned two chairs that he kept at Tent City, including an antique chair that had been signed by the residents of Tent City over the years.

33.    Mr. Wilson and other Tent City residents communally shared roughly fifteen foldable camping chairs, and a community storage tent that contained a couple dozen sleeping bags, blankets, propane, and spare tents.

34.    Mr. Wilson feels that Tent City was the best community that he had ever seen. They would have stragglers come in that wanted a place to eat or sleep. Those individuals were allowed to eat in the community kitchen.

35.    Mr. Wilson got up every morning to clean around the community kitchen at Tent City. Mr. Wilson was very proud of Tent City, and he saw to it that it was kept clean.

36.    As a long-term resident of Tent City, Mr. Wilson helped to enforce the rules at Tent City:

        a.    Everyone had to respect the place that they lived together

        b.    Keep Tent City clean

        c.    No drugs

        d.    No stealing between the residents

        e.    No fighting

        f.    No disrespecting women

37.    As a more senior member of the Tent City community, Mr. Wilson would participate in meetings to determine whether to kick out a Tent City member if they violated the

rules. On several occasions, these senior community members did take action to kick out a Tent City member.

38.    Around 1:00 p.m. or 2:00 p.m. on January 19, 2016, Mr. Wilson and his fiancé were in their tent trying to keep warm, and visiting with a friend. At that time, about fifteen (15) police officers from the CPD came to Tent City, and made everyone get out of their tents.

39.    The officers stated that they were removing people and dismantling Tent City. Officers from the CPD stated that the residents of Tent City were all evicted immediately, including the Tent City residents who were living under the Spring Street Bridge.

40.    At that time, officers from the CPD told Mr. Wilson that he and his fiancé had five minutes to leave Tent City. Mr. Wilson heard a police officer say: "get your fucking shit and get out of here now. I'm telling you now to get out of here, or we'll arrest you."

41.    Mr. Wilson was unable to carry away his tent or his possessions from Tent City.

42.    Mr. Wilson watched as the CPD and officials or agents of the City of Charleston organized and carried out the removal of his property and the dismantling of Tent City, throwing Mr. Wilson's property, along with the property of other Tent City residents, into dump trucks and immediately compacting it.

43.    Mr. Wilson and his fiancé were unable to take their cats with them when they left Tent City on January 19, 2016. They do not know where they are located and Mr. Wilson and his fiancé have been afraid to go back to Tent City and try to find them because they are afraid that they would be arrested by the CPD.

44.    A volunteer from the local community told Mr. Wilson and his fiancé that some of the confiscated property would be available at Cato Park in the days following January 19, 2016. Mr. Wilson was able to receive a ride to Cato Park on January 20, 2016, but none of his or

his fiance's property was available there because it had all been destroyed by the Defendants on the previous day.

45.    Mr. Wilson recalls that the CPD had not been hostile to Tent City prior to being ordered by Mayor Jones to dismantle Tent City in January 2016. Over the years, the CPD had simply told the residents of Tent City to keep it clean. The CPD had never told Mr. Wilson, prior to January 19, 2016, that they intended to dismantle Tent City.

46.    Neither Mr. Wilson nor his fiancé ever received any notice or letter from the Defendants or anyone else prior to January 19, 2016, informing them of the upcoming eviction and property destruction.

47.    Mr. Wilson has taken many photographs of his personal property at Tent City.

b.    Terry Cutright

48.    Plaintiff Terry Cutright moved to Charleston, West Virginia from his native McDowell County, West Virginia, looking for a better life.

49.    Like many people, Mr. Cutright struggled to make ends meet after coming to Kanawha County. He has not regularly maintained traditional housing.

50.    Mr. Cutright had resided at Tent City continuously for roughly three and a half years up until January 19, 2016. Before coming to Tent City, Mr. Cutright had been staying in a homeless shelter. When it became his understanding that he was no longer permitted to remain at the shelter, a friend told him about Tent City.

51.    Mr. Cutright found that Tent City was a close-knit community of friends. If one of the residents had to leave for any period of time—be it to take a shower or to go visit a friend or family member—the other residents of Tent City would look out for their tent and belongings. Someone would always remain down at Tent City to ensure that the residents' property was

protected and secure.

52.    Mr. Cutright's personal property at Tent City included a tent, some clothes, a drawing pad, drawing pencils and pens, several books on how to draw portraits, prescription eyeglasses, a lantern/batteries, three sleeping bags, pictures of his daughter who lives in Harrison County and whom he only gets to see on holidays (including pictures of her high school graduation), a book bag, a Patriots ball cap, and a Game Boy that his daughter gave to him for Christmas, with games (Mortal Combat, Super Mario World, and Superman).

53.    On January 19, 2016, Mr. Cutright was standing outdoors in the kitchen area at Tent City when roughly 10 to 15 policemen from the CPD arrived around 1:00 p.m. or 2:00 p.m. The CPD told Mr. Cutright that he and the other residents had five minutes to pack their belongings and leave Tent City.

54.    Mr. Cutright believed that he would be arrested if he did not cooperate with the CPD and leave Tent City within five minutes.

55.    So, Mr. Cutright quickly left the kitchen, stuffed a few of his clothes into a small garbage bag, grabbed his wallet, and left his home at Tent City. The CPD took him away in a van along with a few of his friends who were also residents of Tent City.

56.    Mr. Cutright was unable to carry away any of his possessions, other than the bag of clothes and his wallet, when the CPD and the City of Charleston raided Tent City that afternoon.

57.    Upon information and belief, the CPD and the workers from the City of the Charleston had thrown away all of Mr. Cutright's other possessions, and compacted them in trash trucks.

58.    Local volunteer groups had been informed by the CPD that a certain amount of

the Tent City residents' belongings would be salvaged and stored at a hill on the outskirts of town at Cato Park for the residents to attempt to retrieve.

59.     Volunteers from Mount Juliet United Method Church drove Mr. Cutright across town the next day, January 20, 2016, through the snow, to Cato Park to attempt to retrieve his belongings. None of Mr. Cutright's belongings, however, were on the little flatbed truck containing the few items from Tent City that the City of Charleston had not destroyed.

60.     Mr. Cutright never received any letter or other notice from the Defendants or anyone else prior to January 19, 2016, informing him of the upcoming eviction and property destruction.

   c. <u>David Chapman</u>

61.     David Chapman is a homeless resident of the Charleston, West Virginia area. Originally from Ripley, West Virginia, Mr. Chapman wound up in Tent City in Charleston, West Virginia, after falling on hard times while in the Charleston area.

62.     Mr. Chapman had resided at Tent City for about four months at the time of January 19, 2016. Mr. Chapman had been staying in a homeless shelter for a period up until September 2015. In September 2015, it became Mr. Chapman's understanding that he was no longer permitted to remain at the shelter. *See* Ex. 3 (Affidavit of David Chapman).

63.     When Mr. Chapman left the homeless shelter, he began sleeping outside in the Charleston area. Around that time, he broke his shoulder, and put it in a sling while it healed. Two female residents of Tent City found Mr. Chapman lying outside on top of a hill with his broken shoulder. He was extremely cold when they found him. They took him to Tent City, put him by the fire, and gave him a big pink blanket to help him warm up. Mr. Chapman felt that he was quite a sight with his sling and his big pink blanket—but he was grateful to have a place to

stay and friends to support him at that difficult time in his life.

64.    As of January 19, 2016, the personal property that Mr. Chapman had stored at Tent City included twenty years' worth of personal papers (including legal papers, medical records, and pictures of his mom, dad, older brother, two older sisters, and one younger sister), a tent that was passed down to him by a friend who was a former resident of Tent City, three sleeping bags, one lantern, his wedding ring, his wife's wedding ring and engagement ring, his clothes, four small two-pound propane tanks, cash hidden in his pillow case, one pair of eye glasses, one shaving kit, a brand new electric razor that he'd received for Christmas, and other items.

65.    Mr. Chapman relied on there always being a resident of Tent City to stick around the camp and watch the personal property of the Tent City residents. For instance, Mr. Chapman went home to Ripley for ten days in December because his sister had passed away. Mr. Chapman's friends at Tent City kept watch on his personal property while he was away.

66.    On the night of January 18, 2016, Mr. Chapman went to a friend's house to shower. He left his tent and personal property at Tent City under the care and control of his friends at Tent City because he intended to return there the following day.

67.    On January 19, 2016, Mr. Chapman was about to return to Tent City when his friend Randall told him that Tent City was dismantled.

68.    Mr. Chapman's friends who were at Tent City when the CPD raided and dismantled Tent City informed Mr. Chapman that the CPD had indicated that residents of Tent City might be arrested if they went back to retrieve anything from Tent City.

69.    Mr. Chapman was not able to take any of his personal property from Tent City on January 19, 2016.

70.     Upon information and belief, CPD and the City of Charleston had thrown away all of Mr. Chapman's possessions, and compacted them in trash trucks.

71.     Mr. Chapman never received any notice or letter from the Defendants or anyone else prior to January 19, 2016, informing him of the upcoming eviction and property destruction.

d.    <u>Without their personal property at Tent City, many Tent City residents had no place to survive</u>

72.     Defendants' policy and practice of seizing and destroying the personal property of the homeless forced these Plaintiffs to fend for themselves out in the frigid winter, and placed the Plaintiffs at peril of having their homeless status criminalized.

73.     If sufficient space in local homeless shelters happens from time to time to be unavailable because there are restrictions on those beds that disqualify certain groups of homeless individuals (e.g., because a shelter lacks access or support for a person's mental or physical disability, a shelter's curfew hours are incompatible with a person's job duties that require working past those curfew hours, a person exceeds a shelter's maximum stay requirements, or there are insufficient beds available in shelters), then it would be impossible for some homeless individuals, including former residents of Tent City, to have a place to go when removed from an encampment as the Defendants did to the Plaintiffs here.

74.     These Plaintiffs would have remained outside in the freezing cold had it not been for news coverage of the eviction that enabled them to receive charitable donations to stay in a hotel and temporary housing until the winter months had passed.  In these circumstances, the Defendants' policy or practice of seizing and destroying property placed the Plaintiffs at peril of having their homeless status criminalized, in violation of the Eighth Amendment to the United States Constitution.

75.     When adequate shelter space does exist—as is typically the case in Charleston,

West Virginia, where the homelessness advocacy community is strong and successful—individuals have a choice about whether or not to sleep in public. However, when adequate shelter space does not exist, there is no meaningful distinction between the status of being homeless and the conduct of sleeping or camping in public. Sleeping is a life-sustaining activity—i.e., it must occur at some time in some place. Enforcement of the Defendants' policy and practice of seizing property and threatening to arrest the homeless could criminalize a person simply for being homeless if they literally have nowhere that they can legally abide safely. Such a policy and practice is plainly unreasonable.

## CLASS ALLEGATIONS

76.    Plaintiffs bring this action on their own behalf and on behalf of all other similarly situated individuals, pursuant to Rule 23 of the *Federal Rules of Civil Procedure*. The class consists of all individuals whose personal possessions were seized by the City of Charleston and the Charleston Police Department on January 19, 2016, at the place known as Tent City in Charleston, West Virginia.

77.    The requirements of Rule 23 are satisfied as follows:

(a)    The class is numerous, with at approximately thirty (30) members, and joinder is impracticable due to the members' general transience as homeless individuals, physical disabilities, and economically-impoverished status, all of which would frustrate the coordination of multi-plaintiff litigation involving the entire group of affected individuals;

(b)    There are questions of law and fact common to all members of the class, which predominate over any questions affecting only individual members, regarding the circumstances of the search and seizure on January 19, 2106 and the extent to which those actions violated the class members' Fourth and Fourteenth Amendment rights under the U.S.

15

Constitution, and the related West Virginia Constitutional rights; and

(c)     The named Plaintiffs' claims are typical of those of the class as a whole because the named Plaintiffs were subject to the same illegal search and seizure actions, and were injured as a result, in the same manner as were the rest of the class members.

78.     The Plaintiffs have displayed an interest in vindicating the rights of the class members, will fairly and adequately protect and represent the interests of the class, and are represented by skillful and knowledgeable counsel. The relief sought by the named Plaintiffs will inure to the benefit of the class generally.

## FIRST CAUSE OF ACTION
### Violation of Civil Rights Under 42 U.S.C. § 1983
### and the Fourth Amendment to the United States Constitution
### (Right to Be Secure from Unreasonable Seizures)

79.     Plaintiffs repeat and re-allege the foregoing paragraphs.

80.     The Fourth Amendment to the U.S. Constitution provides as follows:

The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const., Amend. VI.

81.     Defendants violated Plaintiffs' Fourth Amendment rights to be free from unreasonable search and seizure of their property without a warrant when the Defendants searched, confiscated, and then destroyed Plaintiffs' property.

82.     Defendants seized Plaintiffs' property under a City policy and practice—created and implemented by Defendant Danny Jones—of seizing and destroying the property of homeless citizens.

83.     The CPD executed the property seizures along with workers acting as agents of

16

the City of Charleston. The CPD and the City acted under a City policy and practice and with the specific intent to deprive Plaintiffs of their constitutional rights to be secure in their property.

84.    Defendants acted unreasonably in searching, seizing, and destroying the Plaintiffs' property, all without a warrant.

85.    Defendants acted unreasonably by not providing the Plaintiffs with an opportunity to retrieve their property before it was destroyed.  All property was seized and destroyed immediately.

86.    As a direct and proximate consequence of the policies and acts of Defendants and their agents and employees, Plaintiffs have suffered loss of their personal property and are entitled to compensatory damages for that loss.

87.    Defendant Jones knowingly, willfully, and unapologetically ordered the violation of the Fourth Amendment rights of the Plaintiffs.

**SECOND CAUSE OF ACTION**
**Violation of Civil Rights Under 42 U.S.C. § 1983**
**and the Fourteenth Amendment to the United States Constitution**
**(Right to Procedural Due Process)**

88.    Plaintiffs repeat and re-allege the foregoing paragraphs.

89.    The Due Process Clause of the Fourteenth Amendment to the United States Constitution prohibits Defendants from depriving Plaintiffs of life, liberty, or property without due process of law.

90.    Plaintiffs have a recognized property interest in their tents and personal belongings stored in these tents. This property interest is protected by the Fourteenth Amendment.

91.    Defendants knowingly disregarded Plaintiffs' constitutional rights to notification prior to seizing and destroying their personal property.

17

92.     Defendants did not give Plaintiffs reasonable notice prior to the seizure of their personal property.

93.     Defendants did not give Plaintiffs reasonable notice prior to the destruction of their personal property.

94.     The property sweeps conducted by Defendants deprived Plaintiffs of their property interest because Plaintiffs' personal property was summarily seized and destroyed.

95.     Defendants violated Plaintiffs' procedural due process rights when they seized and destroyed Plaintiffs' personal property without giving Plaintiffs notice of the impending seizure and destruction, which would have afforded Plaintiffs an opportunity to challenge the seizure and destruction or reclaim their belongings.

96.     As a direct and proximate consequence of the policies, practices, and acts of Defendants and their agents and employees, Plaintiffs have suffered loss of their personal property and are entitled to compensatory damages for that loss.

97.     Defendant Jones knowingly, willfully, and unapologetically ordered the violation of the procedural due process rights of the Plaintiffs.

**THIRD CAUSE OF ACTION**
**Violation of Civil Rights Under 42 U.S.C. § 1983,**
**and the Fifth and Fourteenth Amendments to the United States Constitution**
**(Right to Substantive Due Process)**

98.     Plaintiffs repeat and re-alleges the foregoing paragraphs.

99.     Defendants' policy and practice of seizing and destroying Plaintiffs' property deprives Plaintiffs of fundamental rights—their homes and their belongings, which are vital to their emotional and physical well-being, as evidenced by the stark threats to life and health that the Plaintiffs confronted when they were disbursed from Tent City on one of the coldest days of the year after the Defendants destroyed the Plaintiffs' personal property that was necessary for

their survival.

100.    Defendants knew or should have reasonably known that depriving this vulnerable group of individuals of their homes and personal property would threaten their ability to survive.

101.    Defendants placed Plaintiffs in danger of substantial harm, and Plaintiffs suffered substantial harm as a result of Defendants' policy or practice.

102.    Plaintiffs' interests in survival outweigh Defendants' governmental interests in conducting their policy and practice.

103.    Defendants' policy and practice of seizing and destroying homeless citizens' property without any notice has no relation to any legitimate local government purpose. Defendants do not have a compelling state interest or rational basis for the policy and practice.

104.    As a direct and proximate consequence of the policies, practices, and acts of Defendants and their agents and employees, Plaintiffs have suffered loss of their property—property that was necessary for their physical survival—and are entitled to compensatory damages for the loss of that property.

105.    The Defendants were on specific notice of governmental policies and standards of conduct—set forth by the U.S. Interagency Council on Homelessness and the U.S. Department of Justice—against the destruction of tent encampments of the homeless, and Defendants had received specific notice of feasible alternatives to depriving the residents of Tent City of their belongings that were necessary for survival in the frigid winter months.

106.    Nevertheless, Mayor Danny Jones ordered the Charleston Police Department and the employees or agents of the City of Charleston to destroy the personal property of the residents of Tent City on January 19, 2016.  In so doing, Mayor Jones and the other Defendants acted with deliberate indifference to the rights of the Plaintiffs, so as to shock the reasonable person's

conscience, or to interfere with the basic right to secure one's essential means of survival, which is a right that is implicit in the concept of ordered liberty pursuant to both the West Virginia and United States Constitutions.

107.     By destroying the Plaintiffs' property as set forth herein, the Defendants deprived them of the means to possess that property, in violation of the Fifth and Fourteenth Amendments to the U.S. Constitution.

### FOURTH CAUSE OF ACTION
**Violation of Civil Rights (Security Against Unreasonable Seizure of Property)**
**Guaranteed Under the West Virginia Constitution**
**(Article III, Sec. 6)**

108.     Plaintiffs repeat and re-allege the foregoing paragraphs.

109.     Article III, Sec. 6 of the West Virginia Constitution guarantees the right of people to be secure against unreasonable seizures.

110.     Article III, Sec. 6 of the West Virginia Constitution further guarantees that warrants for seizures shall not issue absent probable cause and a particular description of the intended seizure.

111.     Defendants' policy and practice of unwarranted searching, seizing, and immediately destroying Plaintiffs' property violated Plaintiffs' rights to be secure in their persons, houses, papers, and effects, against unreasonable seizures.

112.     No exigent circumstances justified the unwarranted searching, seizing, and destroying of Plaintiffs' property.

113.     Defendants did not assert or establish that Plaintiffs possessed dangerous or illegal substances at Tent City.

114.     Defendants' policy and practice further violated Plaintiffs' rights under Article III, Sec. 6 by subjecting them to seizures absent any warrant particularly describing the person and

things to be seized, and absent any warrant at all.

115.    As a direct and proximate consequence of the policies, practices, and acts of Defendants and their agents and employees, Plaintiffs have suffered loss of their property.

## FIFTH CAUSE OF ACTION
### Deprivation of Due Process of Law Guaranteed Under the West Virginia Constitution
### (Article III, Secs. 10 and 17)

116.    Plaintiffs repeat and re-allege the foregoing paragraphs.

117.    Article III, Sec. 10 of the West Virginia Constitution guarantees that "[n]o person shall be deprived of life, liberty, or property, without due process of law, and the judgment of his peers."

118.    Article II, Sec. 17 of the West Virginia Constitution guarantees that "[t]he courts of this state shall be open, and every person, for an injury done to him, in his person, property or reputation, shall have remedy by due course of law; and justice shall be administered without sale, denial or delay."

119.    Upon information and belief, Defendants' policy and practice of seizing and destroying Plaintiffs' property without notice and an opportunity for a hearing has deprived Plaintiffs of their rights to due process and to a remedy by due course of law.

120.    As a direct and proximate consequence of the policies, practices, and acts of Defendants and their agents and employees, Plaintiffs have suffered loss of their personal property, as set forth above.

## SIXTH CAUSE OF ACTION
### Violation of Civil Rights Guaranteed under Art. III, Secs. 1 and 10
### of the West Virginia Constitution
### (Right to Substantive Due Process)

121.    Plaintiffs repeat and re-alleges the foregoing paragraphs.

122.    Defendants' policy and practice of seizing and destroying Plaintiffs' property

21

deprives Plaintiffs of fundamental rights—their homes and their belongings, which are vital to their emotional and physical well-being, as evidenced by the stark threats to life and health that the Plaintiffs confronted when they were disbursed from Tent City on one of the coldest days of the year after the Defendants destroyed the Plaintiffs' personal property that was necessary for their survival.

123.    Defendants knew or should have reasonably known that depriving this vulnerable group of individuals of their homes and personal property would threaten their ability to survive.

124.    Defendants placed Plaintiffs in danger of substantial harm, and Plaintiffs suffered substantial harm as a result of Defendants' policy or practice.

125.    Plaintiffs' interests in survival outweigh Defendants' governmental interests in conducting their policy and practice.

126.    Defendants' policy and practice of seizing and destroying homeless citizens' property without any notice has no relation to any legitimate local government purpose. Defendants do not have a compelling state interest or rational basis for the policy and practice.

127.    As a direct and proximate consequence of the policies, practices, and acts of Defendants and their agents and employees, Plaintiffs have suffered loss of their property—property that was necessary for their physical survival—and are entitled to compensatory damages for the loss of that property.

128.    The Defendants were on specific notice of governmental policies and standards of conduct—set forth by the U.S. Interagency Council on Homelessness and the U.S. Department of Justice—against the destruction of tent encampments of the homeless, and Defendants had received specific notice of feasible alternatives to depriving the residents of Tent City of their belongings that were necessary for survival in the frigid winter months.

22

129.    Nevertheless, Mayor Danny Jones ordered the Charleston Police Department and the employees or agents of the City of Charleston to destroy the personal property of the residents of Tent City on January 19, 2016.  In so doing, Mayor Jones and the other Defendants acted with deliberate indifference to the rights of the Plaintiffs, so as to shock the reasonable person's conscience, or to interfere with the basic right to secure one's essential means of survival, which is a right that is implicit in the concept of ordered liberty pursuant to both the West Virginia and United States Constitutions.

130.    By destroying the Plaintiffs' property as set forth herein, the Defendants deprived them of the means to possess that property and to pursue and obtain safety, in violation of Article Three, Sections 1 and/or 10 of the West Virginia Constitution.

a.    "All men are, by nature, equally free and independent, and have certain inherent rights, of which, when they enter into a state of society, they cannot, by any compact, deprive or divest their posterity, namely: The enjoyment of life and liberty, with the means of acquiring and possessing property, and of pursuing and obtaining happiness and safety." W. Va. Const. Art. III, Sec. 1.

b.    "No person shall be deprived of life, liberty, or property, without due process of law, and the judgment of his peers."  W. Va. Const. Art. III, Sec. 10.

**WHEREFORE**, in consequence of the heretofore stated facts and allegations, Plaintiffs request that the Court order the following relief:

A.    Declare that the Defendants' policy, practice, and/or acts of seizing and destroying Plaintiffs' personal property

i.    violate the Plaintiffs' rights to be free from unwarranted searches and unreasonable seizures of their personal property under Article III, Section 6 of the West Virginia

23

Constitution, the Fourth Amendment to the U.S. Constitution, and 42 U.S.C. Sec. 1983; and

        ii.     violate the Plaintiffs' substantive and procedural due-process rights under Article III, Sections 1, 10 and 17 of the West Virginia Constitution, the Fourteenth Amendment to the U.S. Constitution, and 42 U.S.C. Sec. 1983, as set forth above; and

        iii.    should be brought into conformity with the guidelines of the U.S. Interagency Council on Homelessness regarding homeless encampments.

    B.     Certify a class, pursuant to West Virginia Rule of Civil Procedure 23, consisting of all individuals whose personal possessions were seized by the City of Charleston and/or by the Charleston Police Department on January 19, 2016, at the place known as Tent City in Charleston, West Virginia;

    C.     Payment of damages to the Plaintiffs to compensate them for the property that they lost when the Defendants destroyed their property on or about January 19, 2016, and to compensate them for the indignity, danger to health and life, extreme inconvenience, emotional distress, embarrassment, humiliation, and annoyance associated with losing their places of residence and worldly belongings, as well as the costs of pursuing the instant action, all in amounts to be determined by the jury;

    D.     Punitive damages against Defendants in an amount sufficient to ensure that such actions are not repeated by them or by their successors in public office, and in accordance with West Virginia law;

    E.     Award reasonable attorney fees and costs; and

    F.     Provide any and all other relief as may be just and equitable.

**PLAINTIFFS RESPECTFULLY DEMAND A TRIAL BY JURY ON ALL ISSUES SO TRIABLE.**

                         **TERRY CUTRIGHT and JOHN WILSON,**

**By counsel,**

  /s/ Samuel B. Petsonk
Samuel B. Petsonk (WV Bar No. 12418)
Gary M. Smith (WV Bar No. 12602)
Mountain State Justice, Inc.
1031 Quarrier Street, Suite 200
Charleston, West Virginia 25301
E-mail: sam@msjlaw.org
         gary@msjlaw.org
Office: (304) 344-3144
Fax: (304) 344-3145

Lydia C. Milnes (WV Bar No. 10598)
Mountain State Justice, Inc.
215 S. Third St., Ste. 901
Clarksburg, West Virginia 26301
Telephone:  (304) 326-0188
Facsimile:  (304) 326-0189
Email:  lydia@msjlaw.org

25